Kathy WELLS, Administratrix of the Estate of Karl Harris, Plaintiff-Appellant,

v.

Glen RUSHING, a/k/a Bobby Glen Rushing, et al., Defendants-Appellees.

No. 84–4297.

United States Court of Appeals, Fifth Circuit.

March 4, 1985.

Rehearing Denied May 20, 1985.

Jim Waide, West Point, Miss., Michael T. Lewis, Oxford, Miss., for plaintiff-appellant.

Coleman & Coleman, Thomas A. Coleman, Ackerman, Miss., Steven E. Farese, Ashland, Miss., for defendants-appellees.

Before RUBIN, TATE, and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge: *

Under 42 U.S.C. § 1983, Kathy Wells, the surviving widow of Karl Harris, brings this civil rights action against Bobby Glen Rushing, a Maben, Mississippi, police officer, for the alleged use of unreasonable and excessive force and for wrongful death. She also proceeds against the town of Maben for gross negligence in retaining Rushing or in failing properly to train or supervise Rushing and for wrongful death. From an award of $5,000 in damages awarded on the excessive force claim, Wells appeals, challenging the district court's rulings on several issues. Because we find that the court abused its discretion when it denied Wells' motion for delay of trial, we reverse and remand for a new trial of Wells' claims against Rushing. We affirm, however, the judgment in favor of the town of Maben.

## I.

The event that gave rise to this action is the subject of much conflicting testimony. Certain facts are, however, undisputed. During the night of February 3, 1978, Bobby Glen Rushing stopped a vehicle on the side of a highway near Maben, suspecting a traffic violation. The vehicle was being driven by Karl Harris, a 17 year old resident of Maben. His wife, Kathy, now Kathy Wells, was the only passenger.

As Rushing was attempting to arrest Harris for driving while intoxicated, an altercation arose. At this point the stories of

---

* Some of the numerous issues raised on appeal do not have precedential value. Local Rule 47.5 provides: "The publication of opinions that have no precedential value and merely decide particular cases on the basis of well-settled principles of law imposes needless expense on the public and burdens the legal profession." Pursuant to that rule, the Court has determined that non-precedential portions of this opinion should not be published. The place at which the published opinion omits part of the unpublished opinion is indicated by asterisks.

the interested parties sharply diverge. Clearly, though, Harris sustained facial bruises during the altercation. The altercation ended when Rushing shot Harris in the back of the head with his police revolver, a .357 Magnum. Harris died almost immediately. Kathy Wells fled when she heard the shot. Moments later customers of a nearby liquor store arrived on the scene having responded to the sound of the gun shot. They found Harris' body in the ditch at the bottom of the highway embankment down which he had run just before Rushing fired the fatal shot. Rushing, standing near the body, pointed out to the witnesses a .25 caliber pistol which lay clutched in Harris' hand.

Wells then instituted this action, alleging that Rushing had planted the .25 caliber pistol on Harris' body after he had beaten and killed her unarmed husband. Rushing denied these factual allegations and claimed he had not struck Harris and that he shot Harris in self-defense when, as Harris was running down the embankment, he saw Harris draw a pistol and aim it back at him.

After a five-day trial, the jury found that Rushing had used unreasonable and excessive force in striking Harris but that no damages had resulted. The jury also found that the shooting did not constitute excessive force. Finally, the jury found that the town failed to adequately screen, test, or train Rushing but that this did not amount to gross negligence. Accordingly, the jury returned a verdict in favor of Rushing and the town on Wells' claims.

The district court, however, granted Wells' motion for a new trial on the issue of damages on the excessive force finding but entered judgment on the other findings pursuant to Fed.R.Civ.P. 54(b). A panel of this Court having determined that Rule 54(b) certification was improper, and having remanded for further proceedings, the district court itself subsequently awarded Wells $5,000 in damages on the excessive force finding against Rushing: $2,500 in actual damages and $2,500 in punitive damages. The court did not disturb the judgment of no liability for Rushing on the wrongful death claim, or the judgment for the town on all claims. This appeal followed.

On appeal, as at trial, the major controversy centers around the .25 caliber pistol found in Harris' hand, which Wells alleges was a "drop gun," i.e., a gun planted by Rushing after the shooting in order to give the appearance that he acted in self defense. Before the pre-trial conference, prior ownership of the pistol, based on its serial number, was traced to Larry Watson. After the conference, Wells' investigators located and interviewed Larry Watson and his former wife, Carolyn Robinson, but they both denied knowing what became of the pistol after they had purchased it. Since, at this point, they had no "material" testimony to offer, the district court's ruling prohibited listing Watson and Robinson on the pre-trial order as witnesses on Wells' behalf. Rushing himself had been deposed early in the discovery process before the pistol had been traced to the Watsons. He had testified in substance that he had never seen the pistol before the night he shot Karl Harris. Both Wells' and Rushing's attorneys had listed Rushing as a witness on the pre-trial order. A few days before trial, in reciprocal telephone calls, each side had told the other that Rushing would be called as a witness.

On September 25, 1982, two days before trial was to begin, Wells' attorney discovered a connection between Robinson and Rushing: both had worked at the same Jackson, Mississippi, company, Mississippi Industries for the Blind (Mississippi Industries), sometime between 1965 and 1970. Watson and Robinson were served with subpoenas to appear as witnesses. Rushing's attorneys were informed that Wells would attempt to call Watson and Robinson as witnesses. That day, after he had received this information, Rushing's attorney, Steve Farese, spoke to Rushing on the telephone. The content of that conversation is unknown.

On the first day of trial, September 27, the district court denied Wells' motion to

list Watson and Robinson on the pre-trial order as witnesses for the plaintiff's case-in-chief, ruling that the motion came too late. The court indicated, however, that Wells could call Watson and Robinson to impeach any denial by Rushing that he had used a drop gun. This ruling was complicated, however, by the fact that, while Rushing had been present for jury selection seven days before the trial began, he did not personally appear at the trial. There is, in the record before us, no explanation for his disappearance. Wells had not previously subpoenaed Rushing, but at Wells' request the district court ordered the United States Marshal to attempt to serve a subpoena on Rushing on the evening of September 27, after the first day of trial. After a thorough search, Rushing could not be located.

The next day, Wells' counsel informed the court that they would move for a delay if Rushing did not appear at trial on the third day. The court permitted an offer of proof constituted of Larry Watson's testimony to the effect that his ex-wife, Carolyn Robinson, during her tenure at Mississippi Industries, had been in possession of the .25 caliber pistol, that was later found in Karl Harris' hand. This was during the time Rushing himself was also working at Mississippi Industries. Before the offer of proof, Wells' counsel had made clear to the district court that in their deposition of Rushing in June 1981, they had not had an opportunity to develop the connection between Rushing and Robinson because they had been unaware of it at the time. Nevertheless, the district court indicated that it would be hesitant to grant a delay but that it might be amenable to instructing the jury that it could draw an adverse inference from Rushing's absence.[1]

■ On the evening of September 28, a second subpoena issued but, again, Rushing could not be located. The next day, the third day of trial, Rushing did not appear. After the noon recess, Wells called Rushing as a witness. There was, of course, no response and counsel and the court then discussed the matter out of the jury's hearing. Steve Farese, Rushing's counsel, was sworn in as a witness and, after having admitted to speaking with Rushing on September 26 after he had been informed of the potential testimony of Watson and Robinson, invoked the attorney-client privilege to justify his refusal to disclose the content of his conversation with Rushing and when he had last spoken to his client. The court sustained his invocation of the privilege.[2] During this same colloquy the court was informed that that morning Farese had told Wells' counsel that he, Farese, would "hear from" Rushing that afternoon. After informing the court of this, Wells' counsel moved for a delay of trial until Rushing's presence could be secured[3] and also requested the court to order Farese to order Rushing to appear if and when he contacted Farese that afternoon.

The court, citing a civil defendant's right to be absent from trial and citing Wells' counsel's lack of diligence in failing to subpoena Rushing prior to trial, refused both requests. At the same time, the court again refused to permit Wells to call Wat-

---

**1.** The court later refused to give the instruction.

**2.** While it is not an issue on appeal, the mere *fact* that a later conversation occurred may not be privileged and the content of that conversation may not be privileged to the extent it included communications *from* Farese *to* Rushing. The privilege protects communications from the client to the attorney made in confidence for the purpose of obtaining legal advice. *See Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976); *United States v. El Paso Co.,* 682 F.2d 530, 538 (5th Cir.1982), *cert. denied,* — U.S. ——, 104 S.Ct. 1927, 80 L.Ed.2d 473 (1984). It shields communications from the lawyer to the client only to the extent that these are based on, or may disclose, confidential information provided by the client or contain advice or opinions of the attorney. *See United States v. Ramirez,* 608 F.2d 1261, 1268 n. 12 (9th Cir.1979); *In re Sealed Case,* 737 F.2d 94, 101 (D.C.Cir.1984); *Brinton v. Department of State,* 636 F.2d 600, 603 (D.C.Cir. 1980), *cert. denied,* 425 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981).

**3.** While the precise expression of the motion does not appear to be·on the record, it is clear that the motion was made and all parties to the appeal so concede.

son and Robinson other than in rebuttal to Rushing's testimony. Compelled by the circumstances to introduce Rushing's testimony in some form, Wells introduced parts of the Rushing deposition. Counsel for the town of Maben then moved to introduce the remainder of the deposition under Fed.R. Civ.P. 32(a)(4). The court granted the request. At trial, all the parties characterize Rushing's deposition testimony as virtually the only positive evidence of self-defense.

By the third day of trial Wells' counsel, through a private investigator, had discovered that Eddie Moore, a former employee of Mississippi Industries, claimed to have seen Rushing and Robinson "kissing and holding hands" in the parking lot of the company during their tenure there. The substance of his testimony was communicated to the trial court at the end of the third day and he testified in detail on the morning of the fourth day, September 30.

## II.

Wells challenges the district court's denial of her motion for delay. While the court's ruling concerning the status of the rebuttal witnesses was proper, we think that under the circumstances the denial of delay constituted an abuse of discretion.

## A.

■ "The decision to grant or deny a continuance lies within the sound discretion of the district court." *Rhodes v. Amarillo Hospital District*, 654 F.2d 1148, 1153 (5th Cir.1981). Denial of a continuance requested in order to locate a witness scheduled to appear is not an abuse of discretion where deposition testimony, the content of which is not substantially and materially different from what live testimony would have revealed, is available. *Ziegler v. Akin*, 261 F.2d 88, 91 (10th Cir.1958).[4] Responding to this principle, Wells contends that Rush-

ing's deposition was an inadequate substitute for his live testimony because the deposition had been taken before Wells was aware of Rushing's alleged acquaintance with one of the prior owners of the .25 caliber pistol, Carolyn Robinson. Consequently, she argues, vital cross-examination of Rushing on the drop gun issue, the central issue in the case against Rushing, was lost due to his absence from the trial.

■ Knowing that Wells would be deprived of important testimony, the district court denied the motion for delay on the ground that the deprivation was due to Wells' own attorneys' lack of diligence in failing to subpoena Rushing prior to trial. On balance, we think this was an abuse of discretion. First, as is obvious from the above, the importance of Rushing's testimony weighs on both sides of the scale: it increases the value to Wells' case of the delay and the amount of prejudice that would result from a denial of delay, but it also diminishes the reasonableness of Wells' attorneys' failure to subpoena Rushing. However, we think the failure to subpoena Rushing prior to trial was adequately justified.

■ Under normal circumstances it is reasonable to expect a party defendant to appear for trial, but the circumstances surrounding Rushing's absence even more compellingly justify Wells' failure to subpoena Rushing: Rushing had been present at jury selection the week before the trial began; Rushing had been listed as a witness on the pre-trial order, not only by Wells' counsel, but by Farese, Rushing's own counsel; and, most critically, there is evidence in the record, undisputed by Farese, that he had telephoned Wells' counsel only days before trial and confirmed that Rushing would take the stand as a witness in his own behalf. In the particular circumstances here evidenced,[5] Wells'

---

**4.** *Cf. Lopez v. Aransas Independent School District*, 570 F.2d 541, 544 (5th Cir.1978) (no abuse of discretion where absent witness' deposition was available); *Behar v. Jenkins*, 309 F.2d 160, 161 (5th Cir.1962) (even if no deposition avail-

able, no abuse of discretion where testimony of absent witness would have been cumulative).

**5.** Of course, we do not hold that there is an absolute requirement that a defendant in a civil case attend trial. Our reasoning is therefore

attorneys were well within the ambit of reasonableness in relying on these actions and representations and concluding that serving a subpoena on Rushing would be redundant and wasteful of administrative resources.[6]

Moreover, while the district court was unaware at the time it ruled that Farese had assured Wells' counsel that Rushing would be a witness in his own behalf, it had become clear by the middle of the third day of trial how critical Rushing's presence was to Wells' case. Not only was Wells placed in a dilemma concerning introducing Rushing's deposition, virtually the only positive evidence of self-defense, she was deprived of the opportunity to confront Rushing before the jury with the testimony of Larry Watson and, later, Eddie Moore, and with the presence of Carolyn Robinson. While estimates of the effect of this confrontation on the outcome of the trial border on speculation, we are convinced that the Rushing deposition was inadequate as a substitute for his personal presence, especially given the circumstantial nature of the evidence against him: the jury was entitled to evaluate Rushing's response to and demeanor during the confrontation since no direct positive proof of a connection between him and the .25 caliber pistol was available. It having become obvious, especially after Eddie Moore's testimony on the fourth day of trial, that some of the witnesses were lying, the jury should have had the opportunity to observe the demeanor under cross-examination of the only witness who was involved directly in Karl Harris' death and was a party to the lawsuit, and whose credibility was therefore most critically relevant. *See generally,* Fed.R.Civ.P. 43; *NLRB v. Dinion Coil Co.,* 201 F.2d 484 (2d Cir.1952) (credibility judgment as pivotal factor in unreviewability of trial court's findings); 5 Wigmore, Evidence § 1367 at 29 (3d ed. 1940) (importance of cross-examination in discovery of truth); Stewart,

"Perception, Memory and Hearsay," 1970 Utah L.Rev. 1, 22 (same).

We therefore conclude that since the content of the deposition testimony was substantially and materially different from what the live testimony would have revealed, the district court should have granted a delay until such time as Rushing could be located or his absence explained. In consequence, Wells should be afforded a new trial of her claims against Rushing.

### B.

■ While the district court's denial of Wells' motion for delay was an abuse of discretion as to the claims against Rushing, his absence did not in any way prejudice Wells' presentation of her claims against the town of Maben. The judgment in favor of the town should therefore be affirmed.

Wells' claim against the town amounted to a charge of gross negligence in failing properly to train and supervise Rushing and in retaining him on the police force knowing his propensity for violence. Relevant to these claims would have been the testimony of town and police department officials as to the policies and practices focused on training and supervising police officers, the testimony of those supervisors familiar with the training and supervision Rushing actually received, the testimony of those privy to the town's knowledge of past events that may have indicated Rushing's inadequate training or violent propensity, testimony of experts on police training as to what constitutes proper preparation for the stresses and emergencies that police officers must confront. At trial, Wells produced testimony from each category, but even had she failed to produce such testimony, it was available to her regardless of Rushing's absence. To that extent, the denial of delay did not prejudice her

---

consistent with that in *GFI Computer Industr. Inc. v. Fry,* 476 F.2d 1, 5 (5th Cir.1973).

**6.** Wells' attorneys had previously been encouraged to be sparing in their use of the court's subpoena power when the district court had rebuked them in a response to their motion for subpoena expenses for listing forty witnesses on the pre-trial order without disclosing at length the witnesses' materiality.

presentation of the claims against the town.

 Moreover, to the extent Rushing's testimony would have been probative of the training he received, and, possibly, of the town's knowledge of prior instances of violent behavior, it was available in Wells' deposition of Rushing. *See Ziegler v. Akin*, 261 F.2d at 91; *see also supra* note 4. Wells contends that the Rushing deposition was an inadequate substitute for his live testimony because, at the time it was taken, Wells was not aware of his history of abusive or violent behavior. Even if her contention were supported in the record, we see no reason why she could not have adduced, indeed the record plainly demonstrates that she did adduce, such proof through other witnesses. His live testimony would have been primarily cumulative. Thus, as distinct from the evidence relevant to the claims against Rushing himself, Wells had access to an adequate substitute for Rushing's live testimony concerning the claims against the town; and, finally, Wells has made no showing, other than the bare conclusory statement of prejudice, that her inability to cross-examine Rushing as to this behavior influenced the trial in any way, much less that it "was material to the extent that it would have changed the jury's verdict, if [it had been] received." *Behar*, 309 F.2d at 161.[7] Accordingly, we affirm the district court's judgment in favor of the town of Maben.[8]

\* \* \* \* \* \*

For the reasons set forth above, the judgment of the district court is affirmed in part and reversed in part and the case is remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART.

REVERSED AND REMANDED IN PART.

---

**7.** A further distinction between the prejudice here and that concerning the claims against Rushing is that the evidence of his propensity for violence and the town's knowledge of such was more equivocal and somewhat less critical to the issues than that linking Rushing with the drop gun.

**8.** Since Rushing was sued only in his individual capacity, the town of Maben could not be required to pay any judgment entered against Rushing subsequent to remand. *See Brandon v. Holt,* — U.S. —, —— —— ——, 105 S.Ct. 873, 877–79, 83 L.Ed.2d 878 (1985). However, if Wells is permitted to amend her complaint and she does so to the end that Rushing is sued solely in his *official* capacity, *Brandon, supra,* would probably require the town to pay a judgment entered against Rushing.